STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. CHARLES D. STEVER, DEFENDANT-APPELLANT.

Argued January 6, 1987—Decided June 30, 1987.

**544**

*Bruce L. Atkins* argued the cause for appellant (*Contant, Contant, Schuber, Scherby & Atkins,* attorneys; *Andrew T. Fede,* on the briefs).

*Boris Moczula,* Deputy Attorney General, argued the cause for respondent (*W. Cary Edwards,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

HANDLER, J.

Defendant, Charles D. Stever, seeks reversal of his conviction for driving while under the influence of intoxicating liquor, contrary to *N.J.S.A.* 39:4–50(a). This appeal presents us with the following issues: whether the Supreme Court's decision in *Berkemer v. McCarty,* 468 *U.S.* 420, 104 *S.Ct.* 3138, 82 *L.Ed.*2d 317 (1984), requiring the administration of *Miranda* warnings in connection with arrests for minor traffic offenses, should be applied retroactively; whether a police officer's request for a suspect to submit to a breathalyzer test constitutes "interrogation" within the meaning of *Miranda v. Arizona,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966); and whether a defendant's refusal to submit to a breathalyzer test may be used as evidence against him on a charge of driving while intoxicated.

## I.

The facts of this case are largely uncontroverted. On January 4, 1984, at approximately 7:30 p.m., defendant, Charles D. Stever, finished work at his job as a greenhouse construction worker. After stopping at his home in Park Ridge for one hour, defendant reported to the Ski Barn in River Edge, where he held a second job. At approximately 11:45 p.m., defendant left this store and proceeded to a friend's place of business in Westwood. Defendant testified that while at his friend's store, he consumed two 12–ounce beers over a one-hour period. Thereafter, defendant and his friend went to a bar called "Talk of the Town" where defendant says that he had one more beer. Defendant left this bar at 3:00 a.m. and proceeded to Broadway Avenue in Woodcliff Lake.

At approximately 3:05 a.m., Officer Michael Origoni of the Woodcliff Lake Police Department began to follow defendant's automobile. Officer Origoni testified that defendant was travelling at 27.5 miles per hour in a 35 mph zone, and that he observed defendant's car cross the center line twice. Consequently, Origoni stopped defendant's vehicle and asked to see his driver's license, insurance and registration. According to the officer, defendant had difficulty producing these documents. Origoni also observed an open, half-full bottle of beer in the center console of the car and noticed that defendant's face was flushed, that his eyes were bloodshot, and that his breath carried an odor of alcohol.

Officer Origoni requested that defendant step out of his car and undertake certain field sobriety tests. By this time, Patrolman Michael Arnone had arrived at the scene and witnessed all tests administered. Defendant was asked twice to recite the alphabet and, according to Origoni, failed on each attempt, speaking in a slow, slurred manner and mixing up the order of the letters. The officer testified that defendant was also unable to perform two motor coordination tests; the "heel-to-toe" test, and the "finger-to-nose" test. After the completion of the tests, Origoni asked defendant where he had been earlier in the evening. Defendant replied that he had been at "Talk of the Town," where he had imbibed three or four bottles of beer.

Defendant testified to a different version of the events at the scene of the stop, asserting that he successfully performed all field sobriety tests administered by Origoni. However, Patrolman Arnone's testimony substantially corroborated Origoni's version of the incident. Arnone's description of defendant's failure of the field tests mirrored Origoni's testimony. Moreover, Officer Arnone testified that defendant's face was flushed; that his eyes were bloodshot, watery and glassy; that his speech was slurred; and that he was unable to maintain his balance while speaking to Origoni.

After the sobriety tests, Officer Origoni placed defendant under arrest, searched him, and took him to police headquarters. Arnone testified that upon arriving at the station, defendant staggered up the stairs, swayed, and leaned against a wall for support. Origoni similarly stated that defendant could not stand without support from nearby filing cabinets.

At police headquarters, the Alcohol Breathalyzer Refusal Form [1] was recited to defendant four times. After each recital, defendant refused requests to submit to a breathalyzer test. After one request, defendant told Origoni that he would be "fucked" if he took the breathalyzer test.[2] At no point subsequent to the initial stop was defendant advised of his *Miranda* rights.

Defendant was convicted in the Municipal Court of Woodcliff Lake of operating a motor vehicle while under the influence of intoxicating liquor, contrary to *N.J.S.A.* 39:4–50(a), refusing to consent to a breathalyzer test, in violation of *N.J.S.A.* 39:4–50.2, and consuming an alcoholic beverage while operating a motor vehicle, contrary to *N.J.S.A.* 39:4–51a. On the driving-while-intoxicated charge, defendant received a sentence of 180 days imprisonment, a $1,000.00 fine, and a 10–year suspension of driving privileges.[3] On the refusal charge, defendant received a $250.00 fine and a license suspension of six months. Finally, for the charge of consumption while operating a motor vehicle, the court assessed a $200.00 fine.

---

[1] In relevant part, the Alcohol Breathalyzer Refusal Form advises the accused that he is required by law to take a breath test and that a refusal to do so constitutes a violation of *N.J.S.A.* 39:4–50.2 and will result in a fine of not less than $250.00 and a license suspension of six months. *N.J.S.A.* 39:4–50.4a. *See State v. Leavitt,* 107 *N.J.* 534 (1987), a case decided today, discussing the Alcohol Breathalyzer Refusal Form.

[2] At trial, defendant asserted that he meant only that he would be prejudiced if the breathalyzer test results were inaccurate.

[3] This was defendant's third conviction under *N.J.S.A.* 39:4–50(a). The prior convictions occurred seven and nine years before the trial.

Defendant appealed his driving-while-intoxicated conviction to the Superior Court, Law Division; he did not appeal his other two convictions. The Superior Court remanded the case to the Municipal Court for additional testimony concerning alibi witnesses. The Municipal Court conducted a second hearing, found defendant guilty, and imposed the original sentence. Defendant appealed his conviction a second time. The Superior Court conducted a *de novo* review of the record and affirmed both the conviction and sentence.

Defendant filed a notice of appeal with the Appellate Division, arguing, *inter alia*, that his conviction should be overturned on the following grounds: (1) defendant's post-arrest statements were erroneously admitted at trial since defendant was not advised of his *Miranda* rights; and (2) the trial court erred in admitting evidence of defendant's refusal to submit to a breathalyzer test. The Appellate Division, in an unpublished opinion, affirmed defendant's conviction and sentence, finding defendant's contentions to be "clearly without merit" under Rule 2:11–3(e)(2).

We granted certification, 104 *N.J.* 436 (1986).

## II.

Defendant first argues that the Supreme Court's decision in *Berkemer v. McCarty, supra,* 468 *U.S.* 420, 104 *S.Ct.* 3138, 82 *L.Ed.*2d 317, requires suppression of his post-arrest statements. In *Berkemer,* the Court extended its ruling in *Miranda v. Arizona, supra,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694, to arrests for minor traffic violations, holding that a failure to give the *Miranda* warnings in these situations will lead to suppression of all post-arrest responses to police interrogation. *Berkemer v. McCarty,* 468 *U.S.* at 434, 104 *S.Ct.* at 3147, 82 *L.Ed.*2d at 331. The State contends that *Berkemer* should not govern in defendant's case because this opinion was issued subsequent to his arrest. In addition, the State argues that even if *Berkemer* applies, defendant's statements are admissi-

ble since they were not given in response to police interroga-
tion. Thus, we must first decide whether the Court's ruling in
*Berkemer* should be given retroactive effect. This determina-
tion requires an examination of Supreme Court decisions deal-
ing with the retroactivity of new rules of criminal procedure.

In *United States v. Johnson,* 457 *U.S.* 537, 102 *S.Ct.* 2579, 73
*L.Ed.*2d 202 (1982), the Supreme Court attempted to clarify the
law governing the retroactive effect of its criminal procedure
precedents, an area that had been marked by inconsistency and
confusion. There, the Court dealt with the retroactivity of
*Payton v. New York,* 445 *U.S.* 573, 100 *S.Ct.* 1371, 63 *L.Ed.*2d
639 (1980), which held that the fourth amendment prohibits the
police from making a warrantless, nonconsensual entry into a
suspect's home to make a routine felony arrest. The Court
ruled that its decisions "construing the Fourth Amendment
[are] to be applied retroactively to all convictions that [are] not
yet final at the time the decision [is] rendered." *United States
v. Johnson, supra,* 457 *U.S.* at 562, 102 *S.Ct.* at 2594, 73 *L.Ed.*
2d at 222.[4] However, the Court articulated an exception to this
general proposition, holding that a new rule of criminal proce-
dure that represents a "clear break with the past" should not
be given retroactive effect. *Id.* at 549, 102 *S.Ct.* at 2587, 73
*L.Ed.*2d at 213.[5] The Court stated that a finding of non-re-

[4]The Court expressed no view as to the retroactive application of decisions
construing any constitutional provision other than the fourth amendment.
*United States v. Johnson, supra,* 457 *U.S.* at 562, 102 *S.Ct.* at 2594, 73 *L.Ed.*2d at
222. However, in *Shea v. Louisiana,* 470 *U.S.* 51, 59, 105 *S.Ct.* 1065, 1070, 84
*L.Ed.*2d 38, 47 (1985), the Court held that the *Johnson* rule is to be applied in
all direct appeals involving the retroactive effect of its fifth amendment
rulings.

[5]The Supreme Court held that a "clear break with the past" exists only when
a decision (1) explicitly overrules a past precedent of the Supreme Court; (2)
disapproves a practice that the Supreme Court has arguably sanctioned in prior
cases; or (3) overturns a longstanding and widespread practice to which the
Supreme Court has not spoken, but which a near-unanimous body of lower
court authority has expressly approved. *United States v. Johnson, supra,* 457
*U.S.* at 551, 102 *S.Ct.* at 2588, 73 *L.Ed.*2d at 215.

troactivity is compelled in these cases because of the reliance by law enforcement authorities on the superseded law and because of the deleterious effect on the administration of justice that retroactive application would produce. *Id.* at 550, 102 *S.Ct.* at 2587, 73 *L.Ed.*2d at 214.[6]

In *Griffith v. Kentucky,* 479 *U.S.* ——, 107 *S.Ct.* 708, 93 *L.Ed.*2d 649 (1987), the Supreme Court undertook a reexamination of the rationale underlying the "clear break" exception to the general proposition that new rules of criminal procedure should be retroactive to cases pending on direct review.[7] After reviewing its precedents dealing with the issue of retroactivity, the Court abolished the exception, ruling:

> [A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a "clear break" with the past.
>
> [*Id.* at ——, 107 *S.Ct.* at 716, 93 *L.Ed.*2d at 661.]

The Court stated that once it propounds a new rule in a given case, "the integrity of judicial review requires that we apply that rule to all similar cases pending on direct review." *Id.* at ——, 107 *S.Ct.* at 713, 93 *L.Ed.*2d at 658. In addition, the Court noted that abandoning the "clear break" exception furthers the proposition that similarly situated defendants should be treated the same. *Id.* at ——, 107 *S.Ct.* at 715, 93 *L.Ed.*2d at 661.

■ We conclude that the rule articulated in *Griffith v. Kentucky, supra,* 479 *U.S.* ——, 107 *S.Ct.* 708, 93 *L.Ed.*2d 649,

---

[6]In *State v. Gervasio,* 94 *N.J.* 23, 27 (1983), we relied on the "clear break" test articulated in *Johnson* in holding that the Supreme Court's ruling in *Delaware v. Prouse,* 440 *U.S.* 648, 99 *S.Ct.* 1391, 59 *L.Ed.*2d 660 (1979) (random stops of vehicles on public roads violates fourth amendment) should not be applied retroactively.

[7]The Supreme Court was dealing with the retroactive application of *Batson v. Kentucky,* 476 *U.S.* 79, 106 *S.Ct.* 1712, 90 *L.Ed.*2d 69 (1986), which held that a defendant in a state criminal trial can establish a prima facie case of racial discrimination, violative of the fourteenth amendment, based on the prosecution's use of peremptory challenges to strike members of the defendant's race from the jury venire.

mandates the retroactive application of *Berkemer v. McCarty, supra,* 468 *U.S.* 420, 104 *S.Ct.* 3138, 82 *L.Ed.*2d 317, to the facts of this case. The State's arguments to the contrary are wholly unpersuasive. The State contends that the *Griffith* rule is inapplicable to Supreme Court decisions that "extend [the] long-standing rule of exclusion first announced in *Miranda.*" This assertion is based on the Court's decision in *Johnson v. New Jersey,* 384 *U.S.* 719, 86 *S.Ct.* 1772, 16 *L.Ed.*2d 882 (1966), which applied the three-prong retroactivity test first articulated in *Linkletter v. Walker,* 381 *U.S.* 618, 85 *S.Ct.* 1731, 14 *L.Ed.*2d 601 (1965),[8] and refused to give retroactive effect to *Miranda v. Arizona, supra,* 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694. The Court held that prospective application of *Miranda* is "particularly appropriate" because of the "unjustifiable burden on the administration of justice" which retroactivity would produce. *Johnson v. New Jersey, supra,* 384 *U.S.* at 732–33, 86 *S.Ct.* at 1780–81, 16 *L.Ed.*2d at 892. For the following reasons, the State's position is incorrect.

First, the language of *Griffith v. Kentucky, supra,* 479 *U.S.* ——, 107 *S.Ct.* 708, 93 *L.Ed.* 2d 649, is clear and unambiguous, allowing for no exceptions. The Court holds simply that "a new rule for the conduct of criminal prosecutions is to be applied retroactively." *Id.* at ——, 107 *S.Ct.* at 716, 93 *L.Ed.*2d at 661. Second, the *Linkletter* retroactivity test that was applied in *Johnson v. New Jersey, supra,* 384 *U.S.* 719, 86 *S.Ct.* 1772, 16 *L.Ed.*2d 882, was explicitly overruled in *United States v. Johnson, supra,* 457 *U.S.* 537, 102 *S.Ct.* 2579, 73 *L.Ed.*2d 202, at least with regard to those cases pending on direct review. Third, the State argues essentially that Supreme Court decisions extending *Miranda* should not be given retrospective

---

[8]The *Linkletter* test established three criteria for determining the retroactivity of new rules of criminal procedure: (1) the purpose behind the new rule; (2) any reliance by law-enforcement authorities on the prior rule of law; and (3) the effect on the administration of justice of retroactive application. *Linkletter v. Walker, supra,* 381 *U.S.* at 629, 85 *S.Ct.* at 1738, 14 *L.Ed.*2d at 608.

effect because of the "unjustifiable burden on the administration of justice" that such an action would produce. This assertion is nothing more than a re-articulation of the "clear break" rationale, which was explicitly abandoned in *Griffith v. Kentucky, supra,* 479 *U.S.* at ——, 107 *S.Ct.* at 716, 93 *L.Ed.*2d at 661. The Supreme Court specifically rejected this factor as a relevant consideration in determining the retroactivity of new rules of criminal procedure. Finally, the premise underlying the State's argument is erroneous. Supreme Court decisions that "extend [the] long-standing rule of exclusion first announced in *Miranda*" have been given retroactive effect. In *Shea v. Louisiana,* 470 *U.S.* 51, 105 *S.Ct.* 1065, 84 *L.Ed.*2d 38 (1985), the Court held that the fifth-amendment rule announced in *Edwards v. Arizona,* 451 *U.S.* 477, 101 *S.Ct.* 1880, 68 *L.Ed.* 2d 378 (1981), is retroactive to cases on direct review when *Edwards* was decided.[9]

Our determination that *Berkemer v. McCarty, supra,* 468 *U.S.* 420, 104 *S.Ct.* 3138, 82 *L.Ed.*2d 317, must be retroactively applied to the facts of this case does not end our inquiry as to the admissibility of defendant's post-arrest statements. The State contends that even if *Berkemer* governs, defendant's statements were not given in response to police interrogation and are, therefore, admissible.

It is settled that *Miranda* warnings must be administered only in the context of a custodial interrogation. *Miranda v. Arizona, supra,* 384 *U.S.* at 444, 86 *S.Ct.* at 1612, 16 *L.Ed.*2d at 706. Voluntary statements—those not elicited through interrogation—made by a suspect while in custody are admissible at trial. *Id.* at 478, 86 *S.Ct.* at 1630, 16 *L.Ed.*2d at 726. The question is whether a police request for a suspect to take a

---

[9]In *Griffith, supra,* 479 *U.S.* at ——, 107 *S.Ct.* at 715, 93 *L.Ed.*2d at 660, the Court noted that its opinion in *Shea* expressed some doubt about the continued viability of the "clear break" exception but that there was no need to decide the issue in that case. *Shea v. Louisiana, supra,* 470 *U.S.* at 59 n. 5, 105 *S.Ct.* at 1070 n. 5, 84 *L.Ed.*2d at 46 n. 5.

breathalyzer test is "interrogation" within the meaning of *Miranda.* In *Rhode Island v. Innis,* 446 *U.S.* 291, 100 *S.Ct.* 1682, 64 *L.Ed.*2d 297 (1980), the Supreme Court, addressing the issue for the first time, held that police words or actions "normally attendant to arrest and custody" are not included within the definition of "interrogation." *Id.* at 301, 100 *S.Ct.* at 1689, 64 *L.Ed.*2d at 308. In *South Dakota v. Neville,* 459 *U.S.* 553, 103 *S.Ct.* 916, 74 *L.Ed.*2d 748 (1983), the Supreme Court ruled that asking a suspect to submit to a blood-alcohol test falls within this exception to the definition of "interrogation" and that a suspect's "choice of refusal thus enjoys no prophylactic Miranda protection." *Id.* at 564 n. 15, 103 *S.Ct.* at 923 n. 15, 74 *L.Ed.*2d at 759 n. 15; *see also State v. DeLorenzo,* 210 *N.J.Super.* 100, 104 (App.Div.1986) ("a simple request to submit to a chemical test does not constitute interrogation."). Consequently, defendant's statement that he would be "f ...d" if he took a breathalyzer test was not made in response to custodial interrogation and was properly admitted into evidence at defendant's trial.

In sum, we hold that the Supreme Court's decision in *Berkemer v. McCarty, supra,* 468 *U.S.* 420, 104 *S.Ct.* 3138, 82 *L.Ed.*2d 317 must be applied to the facts of this case. However, that decision does not compel the suppression of defendant's post-arrest statements since those statements were not made in response to police interrogation while defendant was in custody.

### III.

Defendant bases his second ground for reversal on the contention that the trial court erred in admitting evidence of his refusal to submit to a breathalyzer test. Defendant argues that this evidence is inadmissible under New Jersey's common-law privilege against self-incrimination and under the State Constitution's due process clause.

In *South Dakota v. Neville, supra,* 459 *U.S.* 553, 103 *S.Ct.* 916, 74 *L.Ed.*2d 748, the Supreme Court considered, and rejected, the same arguments made by this defendant, but in the context of federal constitutional guarantees. There, the defendant was arrested for driving while intoxicated and was asked to submit to a blood-alcohol test. Prior to this request, the defendant was warned of the consequences of a refusal. *Id.* at 555 n. 2, 103 *S.Ct.* at 918 n. 2, 74 *L.Ed.*2d at 753 n. 2. This warning was substantially similar to the one that was recited to defendant in this case. *Supra* at 547 n. 1.[10] The defendant refused to take the test, stating: "I'm too drunk, I won't pass the test." *Id.* at 555, 103 *S.Ct.* at 918, 74 *L.Ed.*2d at 753–54.

On the fifth amendment issue, the Supreme Court first noted that most courts have held that the introduction of refusal evidence does not violate a defendant's privilege against self-incrimination. *Id.* at 560, 103 *S.Ct.* at 920, 74 *L.Ed.*2d at 757. Many of these courts have based their conclusions on the ground that a refusal to submit to a blood-alcohol test is a physical act rather than a communication. *Id.* at 560, 103 *S.Ct.* at 920, 74 *L.Ed.*2d at 757. However, the Supreme Court did not rest its holding on this rationale, stating that "the distinction between real or physical evidence, on the one hand, and communications or testimony, on the other, is not readily drawn in many cases." *Id.* at 561, 103 *S.Ct.* at 921, 74 *L.Ed.*2d at 757. Instead, the Court held that the privilege against self-incrimination is not violated under these circumstances because the refusal of a suspect to submit to a blood-alcohol test is not a result of state compulsion. *Id.* at 562, 103 *S.Ct.* at 921, 74 *L.Ed.*2d at 757–58.

In arriving at its holding, the Court first noted that a state may force a person suspected of driving while intoxicated to

---

[10]Neither warning advised the suspect that a refusal to submit could be used against him at his trial for driving while intoxicated.

submit to a blood-alcohol test. *Id.* at 559, 103 *S.Ct.* at 920, 74 *L.Ed.*2d at 756.[11] The Court observed, however, that South Dakota, rather than authorizing police officers to administer such tests against a person's will, allows a suspect to refuse the test but attaches certain penalties to a refusal. The Court concluded that this legislatively-created choice does not compel a suspect to refuse: "Given ... that the offer of taking a blood-test is clearly legitimate, the action becomes no *less* legitimate when the State offers a second option of refusing the test, with the attendant penalties for making that choice." *Id.* at 563, 103 *S.Ct.* at 922, 74 *L.Ed.*2d at 758–59.[12]

In *South Dakota v. Neville, supra,* 459 *U.S.* at 564, 103 *S.Ct.* at 923, 74 *L.Ed.*2d at 759, the defendant also argued that the federal due process clause requires that police warn a suspect that a refusal to submit to a blood-alcohol test may be used against him at trial. The Supreme Court rejected this contention on two grounds. First, the Court contrasted the rationale underlying the *Miranda* warnings, stating that the right to silence is one of constitutional dimension and thus cannot be unduly burdened. *Id.* at 565, 103 *S.Ct.* at 923, 74 *L.Ed.*2d at 759–60. In contrast, a suspect's right to refuse a blood-alcohol test "is simply a matter of grace bestowed by the ... Legislature." *Id.* at 565, 103 *S.Ct.* at 923, 74 *L.Ed.*2d at 760. Consequently, there can be no constitutionally-mandated requirement that a suspect be advised of the consequences of exercising this "right." Second, the Court noted that the defendant was specifically warned that a refusal to submit to a blood-alcohol test could lead to a suspension of his driving privileges. *Id.* at

[11]The Court based this conclusion on its earlier decision in *Schmerber v. California,* 384 *U.S.* 757, 86 *S.Ct.* 1826, 16 *L.Ed.*2d 908 (1966), which held that a state-compelled blood test, because it is physical evidence rather than testimonial evidence, does not violate the fifth amendment.

[12]The Court emphasized that the blood-alcohol test is safe, painless, and commonplace, and, therefore, did not constitute an alternative that would almost inevitably lead to a refusal. *South Dakota v. Neville, supra,* 459 *U.S.* at 563, 103 *S.Ct.* at 922, 74 *L.Ed.*2d at 758.

566, 103 *S.Ct.* at 924, 74 *L.Ed.*2d at 760. This warning made it clear that a refusal is not a "safe harbor" free of adverse consequences. Consequently, the Court held that the warning "was not the sort of implicit promise to forego use of evidence that would unfairly 'trick' respondent if the evidence were later offered against him at trial" and, therefore, "comported with the fundamental fairness required by due process." *Id.* at 566, 103 *S.Ct.* at 924, 74 *L.Ed.*2d at 760.

Notwithstanding the Supreme Court's decision in *South Dakota v. Neville, supra,* 459 *U.S.* 553, 103 *S.Ct.* 916, 74 *L.Ed.*2d 748, defendant argues that the admission into evidence of his refusal to submit to a breathalyzer test is barred by New Jersey's common-law privilege against self-incrimination and by the State Constitution's due process clause. Thus, we must decide whether these state law protections should be given a more expansive construction than their federal counterparts.

The New Jersey Constitution contains no provision guaranteeing the right to be free from compelled self-incrimination. However, this privilege has been firmly established as part of our State common law, *State v. Hartley,* 103 *N.J.* 252, 260 (1986), and is now included in the Rules of Evidence, Rules 23 through 25, codified at *N.J.S.A.* 2A:84A–17 to –19.[13] The State Constitution does contain a due process clause. *N.J.Const.* of 1947, art. 1, para. 1.[14] It is well-settled that our State laws, both constitutional and common, may provide greater protec-

---

[13]In particular, *Evidence Rule* 25 states in relevant part:

[E]very natural person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him ... except that under this rule: (a) no person has the privilege to refuse to submit to examination for the purpose of discovering or recording his corporal features and other identifying characteristics or his physical or mental condition. *N.J.S.A.* 2A:84A–19.

[14]Article 1, paragraph 1 provides:

All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending

tions than their federal counterparts. *See, e.g., State v. No-vembrino,* 105 *N.J.* 95 (1987); *In the Matter of Grand Jury Proceedings of Joseph Guarino,* 104 *N.J.* 218 (1986); *State v. Hunt,* 91 *N.J.* 338 (1982); *Right to Choose v. Byrne,* 91 *N.J.* 287 (1982); *State v. Alston,* 88 *N.J.* 211 (1981); *State v. Johnson,* 68 *N.J.* 349 (1975). However, it is equally settled that such enhanced protections should be extended only when justified by "[s]ound policy reasons." *State v. Hunt, supra,* 91 *N.J.* at 345; *State v. Williams,* 93 *N.J.* 39, 59 (1983); *see also Right to Choose v. Byrne, supra,* 91 *N.J.* at 301 ("We proceed cautiously before declaring rights under our state Constitution that differ significantly from those enumerated by the United States Supreme Court in its interpretation of the federal Constitution.").

In this case, the public policy of our State does not support an expansion of state law protections beyond those provided by the federal constitution. We have consistently stated that "the clear public policy of this State is to rid the highways of drunken drivers." *State v. Dyal,* 97 *N.J.* 229, 239 (1984); *see also Kelly v. Gwinnell,* 96 *N.J.* 538, 545 (1984) (this "social goal—the reduction of drunken driving— ... is practically unanimously accepted by society."). In a case decided this term, *State v. Tischio,* 107 *N.J.* 504 (1987), we reiterated this important public policy, stating:

> The overall scheme of [New Jersey's drunk-driving] laws reflects the dominant legislative purpose to eliminate intoxicated drivers from the roadways of this State. To this end, the Legislature, working in tandem with the courts, has consistently sought to streamline the implementation of these laws and to remove the obstacles impeding the efficient and successful prosecution of those who drink and drive.

A determination that a suspect's refusal to submit to a breathalyzer test is inadmissible at his trial for driving while intoxicated would frustrate and impede this strong and consistent public policy. In sum, relevant policy considerations strongly buttress

life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.

our adoption of the holding of the Supreme Court in *South Dakota v. Neville, supra,* 459 *U.S.* 553, 103 *S.Ct.* 916, 74 *L.Ed.* 2d 748, as the proper construction of our State constitutional and common-law protections.

■ Although we have not previously addressed the precise issues raised by defendant, the decisional law in this area supports our conclusion that a suspect's refusal to submit to a breathalyzer test is admissible in evidence. We have consistently held that the taking of a breathalyzer test is non-testimonial in nature and, therefore, is not covered by the privilege against self-incrimination. *State v. Macuk,* 57 *N.J.* 1, 15 (1970); *State v. Blair,* 45 *N.J.* 43, 46 (1965); *State v. King,* 44 *N.J.* 346, 357 (1965). Thus, the State may force a suspect to submit to a chemical test of bodily substances to determine the amount of alcohol in his blood. *State v. Macuk, supra,* 57 *N.J.* at 14.

It follows then that the refusal to take such a test is non-testimonial in nature. In *State v. Cary,* 49 *N.J.* 343 (1967), we upheld the admissibility of the defendant's refusal to submit to a voice test. In arriving at this holding, the Court ruled that compelling a person to speak for the purpose of a voice identification is not covered by New Jersey's common-law privilege against self-incrimination because the physical properties of a person's voice are not testimonial in character. *Id.* at 347–48. We contrasted the United States Supreme Court's decision in *Griffin v. California,* 380 *U.S.* 609, 85 *S.Ct.* 1229, 14 *L.Ed.*2d 106 (1965), which held that a comment by a trial court or prosecutor on a defendant's refusal to testify is unconstitutional. We noted that the Court based its decision on the penalty that such comment imposes on a defendant's exercise of his fifth amendment right. *Id.* at 614, 85 *S.Ct.* at 1232, 14 *L.Ed.*2d at 109–10. We held that this rationale is inapplicable to the issue raised in *Cary* since the defendant there had no constitutional right to refuse to speak solely for the purpose of a voice identification. *State v. Cary, supra,* 49 *N.J.* at 353–54.

In addition, the Court in *Cary, supra,* 49 *N.J.* at 354 noted with approval the decision of the California Supreme Court in *People v. Sudduth,* 65 *Cal.*2d 543, 421 *P.*2d 401, 55 *Cal.Rptr.* 393 (1966), which upheld the admissibility of a suspect's refusal to take a breathalyzer test. In arriving at this holding, the reasoning of the California court was identical to that employed in *Cary,* namely, that *Griffin v. California, supra,* 380 *U.S.* 609, 85 *S.Ct.* 1229, 14 *L.Ed.*2d 106, is inapplicable because there is no underlying constitutional right on the part of a suspect to refuse to submit to a breathalyzer test. *People v. Sudduth, supra,* 65 *Cal.*2d at 546, 421 *P.*2d at 403, 55 *Cal.Rtpr.* at 395.

In *State v. Tabisz,* 129 *N.J.Super.* 80 (App.Div.1974), the court held that the introduction into evidence of a suspect's refusal to take a breathalyzer test is not barred by New Jersey's common-law privilege against self-incrimination. The court felt this conclusion to be compelled by our earlier decision in *State v. Cary, supra,* 49 *N.J.* 343 stating that since "there is no ... right to refuse to take the [breathalyzer] test, the failure of one accused to submit to the test is properly admitted into evidence." *State v. Tabisz, supra,* 129 *N.J.Super.* 83. In sum, we conclude that the admissibility in evidence of a defendant's refusal to take a breathalyzer test does not offend constitutional or common law strictures.

▪ The case law in this area also supports our conclusion that defendant's due process rights were not violated by the police officer's failure to warn defendant that his refusal to submit to a breathalyzer test may be used against him at trial. Although we have never ruled on this precise issue, we find controlling the reasoning of our earlier opinion in *State v. Macuk, supra,* 57 *N.J.* 1.[15] There, one of the issues before the

---

[15]In *State v. Macuk, supra,* 57 *N.J.* at 15–16 we held, *inter alia,* that the *Miranda* warnings are inapplicable to all motor vehicle violations. Of course, this holding has since been overruled by *Berkemer v. McCarty, supra,* 468 *U.S.* 420, 104 *S.Ct.* 3138, 82 *L.Ed.*2d 317.

Court was whether a suspect must be apprised of his *Miranda* rights prior to the administration of a breathalyzer test in order for the results of the test to be admissible at trial. We rejected the applicability of *Miranda* on the ground that "[t]here is no legal right or choice to refuse, despite the authorized additional penalty for refusal in the case of the breath test." *Id.* at 15. This reasoning is equally applicable to the issue raised in the present case. The purpose of the *Miranda* warning is to protect the underlying constitutional right of a criminal suspect to remain silent. *South Dakota v. Neville, supra,* 459 *U.S.* at 565, 103 *S.Ct.* at 923, 74 *L.Ed.*2d at 759–60. Where there exists no underlying constitutional right in need of protection—as in the case of a refusal to submit to a breathalyzer test—no warning requirement is constitutionally mandated.

In a case also decided today, *State v. Leavitt,* 107 *N.J.* 534 (1987), we rejected the defendant's argument that the inherent confusion resulting from the reading to a suspected intoxicated driver of *Miranda* warnings and breathalyzer refusal warnings deprived him of the effective assistance of counsel. In arriving at this holding, we ruled that a defendant has no right, state or federal, to consult with counsel prior to the administration of a breathalyzer test. *Id.* at 539.

We also find persuasive the *Neville* Court's conclusion that the warnings given in that case were not fundamentally unfair. *Id.* 459 *U.S.* at 566, 103 *S.Ct.* at 924, 74 *L.Ed.*2d at 760. As in *Neville,* the defendant in this case was warned that a failure to submit to a breathalyzer test would result in a fine and a suspension of driving privileges. "[I]t is unrealistic to say that the warnings given here implicitly assure[d defendant] that no consequences other than those mentioned [would] occur." *Id.* at 566, 103 *S.Ct.* at 924, 74 *L.Ed.*2d at 760. Thus, we see no reason for reaching a different result under our State Constitution from that arrived at by the Supreme Court in interpreting the federal due process clause.

## IV.

In sum, we hold that the trial court did not err in admitting evidence of defendant's refusal to submit to a breathalyzer test. Although *Berkemer v. McCarty, supra,* 468 *U.S.* 420, 104 *S.Ct.* 3138, 82 *L.Ed.*2d 317, must be retroactively applied to the facts of this case, this opinion does not compel the suppression of defendant's post-arrest statements. Officer Origoni's request that defendant take a breathalyzer test was an action "normally attendant to arrest and custody" and, therefore, did not constitute "interrogation" under *Rhode Island v. Innis, supra,* 446 *U.S.* 291, 100 *S.Ct.* 1682, 64 *L.Ed.*2d 297. Consequently, defendant's post-arrest statements were purely voluntary and fully admissible in evidence. *Miranda v. Arizona, supra,* 384 *U.S.* at 478, 86 *S.Ct.* at 1630, 16 *L.Ed.*2d at 726.

We also hold that the admission into evidence of defendant's refusal to submit to a breathalyzer test did not violate defendant's common-law privilege against self-incrimination, nor did it infringe on defendant's due process rights under the State Constitution. A person suspected of driving while intoxicated has no right to refuse to take a breathalyzer test. Consequently, the admission of such refusal at trial impermissibly burdens no constitutional right. *See Griffin v. California, supra,* 380 *U.S.* 609, 85 *S.Ct.* 1229, 14 *L.Ed.*2d 106; *State v. Cary, supra,* 49 *N.J.* 343. Moreover, because there exists no constitutional right in need of protection, the due process clause does not require that a suspect be warned that a refusal may be used against him at trial.

The judgment below is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For reversal*—None.