735 A.2d 513

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT,
v. BRAYNARD PURNELL, DEFENDANT–
RESPONDENT.

Argued January 20, 1999—Decided July 7, 1999.

*Gerard C. Sims, Jr.,* Deputy Attorney General, argued the cause for respondent (*Peter Verniero,* Attorney General of New Jersey, attorney).

*James K. Smith, Jr.,* Assistant Deputy Public Defender, argued the cause for appellant (*Ivelisse Torres,* Public Defender, attorney).

The opinion of the Court was delivered by

COLEMAN, J.

On March 16, 1992, this Court changed existing statutory and decisional law by holding that in a prosecution for perjury the jury, rather than the judge, must decide the materiality element of the offense. *State v. Anderson*, 127 *N.J.* 191, 603 *A.*2d 928 (1992). The critical issue raised in this post-conviction relief (PCR) appeal is whether *Anderson* should operate retrospectively upon cases finally decided on direct review prior to the date on which *Anderson* was decided. The trial court rejected defendant's PCR application, ruling that *Anderson* should not be applied retroactively to permit a collateral attack upon a judgment of conviction. The Appellate Division in a published opinion reversed. 310 *N.J.Super.* 407, 422–23, 708 *A.*2d 1196 (1998). We granted the State's petition for certification, 156 *N.J.* 385, 718 *A.*2d 1214 (1998), and now reverse.

I

In a jury trial defendant was found guilty of capital murder, hindering his own apprehension by intimidating a witness into giving a false report, possession of a weapon for an unlawful purpose, and perjury. Defendant was originally sentenced to death on the capital-murder conviction and a five-year consecutive term on the perjury conviction. He received additional sentences for the other non-capital counts. In his direct appeal to this Court, defendant did not challenge his perjury conviction. After vacating the death sentence, the Court affirmed all of the convictions on January 15, 1992. *State v. Purnell*, 126 *N.J.* 518, 547, 601 *A.*2d 175. On March 16, 1992, two months after defendant's direct appeal in the State's courts was completed, the Court decided *Anderson*.

*Anderson* held that the determination of the element of materiality in the crime of perjury must be submitted to the jury in order to satisfy an accused's constitutional right to have a jury determine beyond a reasonable doubt the existence of each essential element of the crime.

Three years after defendant's direct appeals had been concluded, defendant filed a petition for PCR on a number of grounds, including that his perjury conviction should be vacated because it was obtained in violation of his Sixth and Fourteenth Amendment rights under the United States Constitution, as well as his state constitutional right to have a jury find each of the elements of the crime of perjury beyond a reasonable doubt. The facts relied on by both courts below are the same as those reported in our decision from defendant's direct appeal. *Purnell, supra,* 126 *N.J.* at 525–29, 601 *A.*2d 175. The pertinent facts are as follows.

On August 26, 1988, defendant fatally stabbed a drug dealer following a dispute over the price of cocaine. Defendant then hid the victim in some undergrowth in his backyard. On the night of the murder, defendant's daughter initially called the police and reported that "[s]omebody is trying to break in my house and now two guys are jumping my dad." *Id.* at 526, 601 *A.*2d 175. The police responded immediately, spoke to defendant's daughter, and performed a cursory search of the backyard. The officers did not encounter defendant or discover the dead body at that time.

During the ensuing police investigation, defendant reported different versions of the events on the night of the murder. He initially informed the police that he saw two men fighting in his backyard, but when he hollered to his daughter to "call the police," the two men ran off. *Id.* at 528, 601 *A.*2d 175. After he was arrested and advised of his rights, however, defendant admitted to the police that he had been involved in the fight between the two men.

Defendant voluntarily appeared before the Grand Jury and described the incident with the two men in his backyard. He told the Grand Jury that at first he had not told the police about his involvement in the fight because "there's a body involved in this," and he was afraid that he might incriminate himself. *Id.* at 529, 601 *A.*2d 175. Defendant also informed the Grand Jury that after trying to chase away the two men in his backyard, he entered his home through the front door.

Defendant's daughter also testified before the Grand Jury and gave testimony that contradicted defendant's Grand Jury testimony. The daughter testified that rather than entering the house through the front door on the night in question, defendant knocked on the bedroom window of the house and she let him in through the bedroom window. At trial, the daughter attempted to corroborate defendant's version of the events by testifying that defendant entered the house through the front door. However, the State impeached the daughter's trial testimony with her Grand Jury testimony, forcing her to admit that her father asked her to be let in through the bedroom window of the house on the night in question.

Based on defendant's testimony before the Grand Jury, he was indicted for perjury. The perjury count charged:

[O]n December 14, 1988, Braynard Purnell testified before the Camden County Grand Jury that on the night of August 26, 1988[,] he had returned to his house after chasing someone behind his house and entered through the front door; whereas, in fact he had waited, after killing Lawrence Talley, for the police who had been summoned to the area by [defendant's daughter], to leave the scene; he then proceeded to tap on the kitchen window and instruct [his daughter] to permit him to climb back into the house through the bedroom window.

During the trial, defense counsel moved to dismiss the perjury count on the ground that defendant's statement that he returned to his home and entered the front door after chasing someone was not material. However, as prescribed by statute at that time, *N.J.S.A.* 2C:28–1b, the trial court determined as a matter of law that defendant's testimony before the Grand Jury concerning how he reentered the house on the night of the crime was material. The court reasoned:

Is it material? Well, if you're attempting to keep your presence outside the house or even at the house that night unknown to those who are investigating ... a disturbance outside, then it does become very material. Because if the Grand Jury believes that he wasn't there at all, they may not have indicted him.... And I think it thus becomes material.

Because the trial court determined the element of materiality as a matter of law, the jury was not informed that materiality was an element of the crime of perjury. The trial court permitted the jury to decide the three remaining elements of the perjury of-

fense: whether (1) the statement was made in an official proceeding; (2) the testimony was given under oath; and (3) the statement given or made was actually false. Defendant did not object to the trial court's failure to submit the element of materiality to the jury.

At the PCR hearing, the trial court determined that the Court's decision in *Anderson* should not be applied retroactively to permit defendant's collateral attack on his perjury conviction. The trial court stated:

> [W]hile [*Anderson*] would apply to cases that were either pending or had been tried but on appeal, this case . . . had been to the Supreme Court . . ., and thus, for intents and purposes of the retroactivity application the case was concluded. . . . [T]his court will not retroactively apply *Anderson* to the perjury [ ] conviction in this case.

On defendant's PCR appeal, the Appellate Division applied the *Anderson* holding to defendant's collateral attack and reversed his perjury conviction. *Purnell, supra,* 310 *N.J.Super.* at 422–23, 708 *A.*2d 1196. The Appellate Division analyzed the retroactivity issue under both state and federal law and concluded that *Anderson* should be applied retroactively to collateral attacks made in a PCR application. *Id.* at 419, 708 *A.*2d 1196.

## II

### -A-

The State argues that the United States Supreme Court's decision in *United States v. Gaudin,* 515 *U.S.* 506, 115 *S.Ct.* 2310, 132 *L.Ed.*2d 444 (1995), supersedes our decision in *Anderson* as the relevant authority on the issue of submitting the element of materiality to the jury in a perjury offense, and thus, federal retroactivity jurisprudence should control our analysis. Although recognizing that both *Gaudin* and *Anderson* promulgated a "new" rule of law regarding the element of materiality in a perjury case, the State contends that the federal criteria for determining retroactivity on collateral review indicate that *Gaudin* should not apply retroactively to defendant's PCR application. The State further

argues that even assuming that New Jersey's retroactivity jurisprudence is applicable, the *Anderson* holding should not apply retroactively to defendant's PCR application.

The State also contends that the failure to have the jury determine the element of materiality in defendant's perjury case was not plain error. The State concludes that any reasonable juror would have found defendant's Grand Jury testimony regarding how he entered the house after the homicide to be material, just as the trial court determined as a matter of law.

Defendant argues that the entire retroactivity issue should be avoided because neither *Anderson* nor *Gaudin* represents a new rule of law. He asserts that the state and federal constitutions have always required a jury to decide each element of a criminal offense. Defendant maintains that in the event that a retroactivity analysis is required, we should apply New Jersey's jurisprudence because *Anderson* was decided first. Finally, defendant argues that even under a dual analysis, he is entitled to complete retroactivity because both *Anderson* and *Gaudin* implicate fundamental constitutional rights.

-B-

A person commits the crime of perjury if he or she during the course of "any official proceeding ... makes a false statement under oath or equivalent affirmation, or swears or affirms the truth of a statement previously made, when the statement is material and he [or she] does not believe it to be true." *N.J.S.A.* 2C:28-1(a). To prove such a charge, the State must establish four elements: (1) that the defendant made a false statement; (2) that the statement was material to the proceeding; (3) that the statement was under oath in an official proceeding; and (4) that the defendant knew the statement was untrue. *Anderson, supra,* 127 *N.J.* at 198, 603 *A.*2d 928.

Prior to the decision in *Anderson,* the issue whether a statement was material was decided by the trial court as a matter of law. *N.J.S.A.* 2C:28-1b. *Anderson,* however, held that the statu-

tory provision "irreconcilably conflict[ed] with the constitutional right of an accused to have a jury determine the existence beyond a reasonable doubt of each essential element of a crime before he or she is convicted." *Anderson, supra,* 127 *N.J.* at 194, 603 *A.*2d 928. That holding was based on the immense importance of both the right to a jury trial and the right to due process of law. *Id.* at 199–201, 603 *A.*2d 928. Although the decision in *Anderson* was grounded in state constitutional law, we recognized that federal constitutional precedents also supported our conclusion. *Id.* at 205, 603 *A.*2d 928.

Three years after *Anderson* was decided, the United States Supreme Court decided the same issue under federal constitutional law in *Gaudin.* The majority in *Gaudin* reached the same conclusion under a federal constitutional analysis as we did in *Anderson* under our state constitutional analysis. *Gaudin, supra,* 515 *U.S.* at 511, 115 *S.Ct.* at 2314, 132 *L.Ed.*2d at 450. The Court concluded that the Fifth and Sixth Amendments to the United States Constitution "require criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Id.* at 510, 115 *S.Ct.* at 2313, 132 *L.Ed.*2d at 449. The Court held that the trial court's refusal to permit the jury to decide the question of materiality in the defendant's perjury trial violated his Fifth Amendment right to due process and his Sixth Amendment right to a jury trial. *Id.* at 523, 115 *S.Ct.* at 2320, 132 *L.Ed.*2d at 458.

██ For reasons we will make clear later in this opinion, we reject defendant's assertion that the entire issue of retroactivity can be avoided by concluding that *Anderson* and *Gaudin* do not represent a new rule of law. If *Anderson* were the only decision requiring a jury to decide the issue of materiality, we could invoke this Court's inherent power to limit the retroactive effect of our decisions. *State v. Lark,* 117 *N.J.* 331, 334, 339, 567 *A.*2d 197 (1989); *State v. Burstein,* 85 *N.J.* 394, 403, 427 *A.*2d 525 (1981). However, in *Gaudin,* the United States Supreme Court decided

the same issue we addressed in *Anderson.* Because *Gaudin* is co-extensive with *Anderson,* and because federal constitutional protections are implicated, "United States Supreme Court precedents control the scope of retroactivity." *Lark, supra,* 117 *N.J.* at 335, 567 *A.*2d 197; *see State v. Stever,* 107 *N.J.* 543, 550–52, 527 *A.*2d 408, *cert. denied,* 484 *U.S.* 954, 108 *S.Ct.* 348, 98 *L.Ed.*2d 373 (1987). Consequently, we are required to conduct both a State and a federal retroactivity analysis involving issues that are " 'among the most difficult' problems that engage the attention of both federal and state courts." *Fischer v. Canario,* 143 *N.J.* 235, 243, 670 *A.*2d 516 (1996) (internal citations omitted); *see State v. Burgess,* 298 *N.J.Super.* 254, 262, 689 *A.*2d 730 (App.Div.1997), *aff'd per curiam,* 154 *N.J.* 181, 184, 712 *A.*2d 631 (1998).

## III

### -A-

Under New Jersey retroactivity jurisprudence, "the threshold inquiry [is] whether the rule at issue is a 'new rule of law' for purposes of retroactivity analysis." *State v. Afanador,* 151 *N.J.* 41, 57, 697 *A.*2d 529 (1997); *State v. Knight,* 145 *N.J.* 233, 249, 678 *A.*2d 642 (1996). If the answer is no, "the retroactivity question never arises and our power to limit the retroactive effect of a decision is not implicated." *Ibid.; see Burstein, supra,* 85 *N.J.* at 403, 427 *A.*2d 525. In order for a decision to be deemed a new rule of law for retroactivity purposes, there must be a "sudden and generally unanticipated repudiation of a long-standing practice." *Afanador, supra,* 151 *N.J.* at 58, 697 *A.*2d 529 (quoting *State v. Cupe,* 289 *N.J.Super.* 1, 12, 672 *A.*2d 1233 (App.Div.1996)). That is, there must be some "appreciable past from which the [new] rule departs." *Ibid.* Both the trial court and the Appellate Division held that *Anderson* announced a new rule of law. *Purnell, supra,* 310 *N.J.Super.* at 415, 708 *A.*2d 1196. Indeed, this Court in *Anderson* stated as much when it acknowledged that it had become "firmly entrenched in the law" based on "the seemingly overwhelming precedent" that in a prosecution for

perjury, the trial court, rather than the jury, decided the issue of materiality. *Anderson, supra,* 127 *N.J.* at 204, 603 *A.*2d 928. Today, we reaffirm that *Anderson* represents a new rule of law. Accordingly, we must now decide which of several retroactivity options available to the Court is appropriate in this case under the three-pronged retroactivity test recently rearticulated in *Knight, supra,* 145 *N.J.* at 252–58, 678 *A.*2d 642.

First, we ask whether the purpose of the *Anderson* rule would be advanced by retroactivity. *Id.* at 251, 678 *A.*2d 642. We note at the outset that there are different classes of purposes that a new rule may advance. At one extreme, a new rule may be intended solely to deter police misconduct. *Burstein, supra,* 85 *N.J.* at 406, 427 *A.*2d 525. In such a case, retroactivity would almost certainly be denied because the new rule's deterrent purpose would not be advanced by retroactive application to past misconduct. *Ibid.* At the other extreme are new rules that " 'overcome an aspect of a criminal trial that substantially impairs its truth-finding function' and which [raise] 'serious questions about the accuracy of guilty verdicts in past trials.' " *Id.* at 406–07, 427 *A.*2d 525 (internal citations omitted). In those cases, given the fundamental constitutional implications, the new rule is often given "complete retroactive effect, regardless of how much the State justifiably relied on the old rule or how much the administration of justice is burdened." *Id.* at 407, 427 *A.*2d 525.

In between those two extremes lies a third category of cases "where the new rule is designed to enhance the reliability of the factfinding process but the old rule did not 'substantially' impair the accuracy of that process." [1] *Id.* at 408, 427 *A.*2d 525. In deciding the question of retroactivity with regard to this third category, "[courts] will not burden the criminal justice system with

---

[1] To determine whether an old rule "substantially impairs" the truth-finding process, we would consider: (1) the likelihood of untrustworthy evidence being admitted under the old rule; and (2) whether the defendant had alternate ways of contesting the integrity of the evidence being introduced against him. *Burstein, supra,* 85 *N.J.* at 408, 427 *A.*2d 525.

the post-conviction-relief applications [on collateral attack] and retrials that would result from a fully retroactive application of the [new rule]." *Knight, supra,* 145 *N.J.* at 258, 678 *A.2d* 642.

The change in *Anderson* from the prior rule of having the court determine the element of materiality was *not* intended to enhance the reliability of the fact-finding process. The reliability of judicial determinations of materiality is not questioned. The old rule requiring the court to determine the element of materiality did not substantially impair the truth-finding process. Under the old rule, the State was still required to prove the element of materiality beyond a reasonable doubt, albeit to the judge and not the jury. If the old rule had, for example, shifted the allocation of the burden of proof regarding the element of materiality, then that rule substantially would have impaired the truth-finding process. That did not occur before the change in *Anderson.* Because the rule prior to *Anderson* did not substantially impair the truth-finding process, the first prong of New Jersey's retroactivity test does not support retroactive application of the *Anderson* rule to defendant's PCR petition.

The second prong of New Jersey's retroactivity test is the degree of reliance placed on the old rule by those who administered it. *Id.* at 251, 678 *A.2d* 642. This factor is evaluated by assessing whether the old rule was administered in "good faith reliance [on] 'then-prevailing constitutional norms.'" *State v. Howery,* 80 *N.J.* 563, 570, 404 *A.2d* 632, *cert. denied,* 444 *U.S.* 994, 100 *S.Ct.* 527, 62 *L.Ed.*2d 424 (1979) (internal citations omitted). The reliability of the old rule was enhanced by a number of precedents reaffirming its validity. *State v. Catania,* 85 *N.J.* 418, 447, 427 *A.2d* 537 (1981); *Gordon v. State,* 48 *N.J.L.* 611, 7 *A.* 476 (E. & A. 1886); *State v. Molnar,* 161 *N.J.Super.* 424, 450, 391 *A.2d* 1225 (App.Div.1978), *rev'd in part on other grounds,* 81 *N.J.* 475, 410 *A.2d* 37 (1980). Indeed, the reliability of the old rule was augmented by its codification in our Code of Criminal Justice, *N.J.S.A.* 2C:28–1b. That high degree of reliability persuaded the Court in *Anderson* to observe that the old rule had "bec[o]me

firmly entrenched in the law." *Anderson, supra,* 127 *N.J.* at 204, 603 *A.*2d 928. The numerous precedents reaffirming the old rule between 1886 and its codification in the Code in 1978, and that remained viable until *Anderson* was decided in 1992, establish reliance under the second prong of the retroactivity test.

The third and final prong of New Jersey's retroactivity test requires us to assess the impact that retroactive application of the new rule of law would have on the administration of justice. *Knight, supra,* 145 *N.J.* at 252, 678 *A.*2d 642. One of the relevant considerations under this factor is the number of cases that would require dismissal or retrial in the event of retroactive application. *Ibid.* We generally avoid applying new rules of law retroactively where "such an application would undermine the validity of large numbers of convictions." *Ibid.* This policy stems from our desire to avoid overwhelming courts with retrials and the difficulty of retrying cases in which the underlying events took place long in the past. *Ibid.; Burstein, supra,* 85 *N.J.* at 410, 427 *A.*2d 525. The Appellate Division found that "our courts [would] not be burdened with a substantial number of perjury retrials as a result of [retroactively applying *Anderson* ]." *Purnell, supra,* 310 *N.J.Super.* at 416, 708 *A.*2d 1196. We disagree.

Unlike *Afanador,* where less than a dozen new trials were anticipated from the retroactive application of a new rule of law, here there are unknown and potentially a very large number of convictions that would be affected by the retroactive application of the *Anderson* decision to defendant's PCR petition. It is conceivable that most living defendants ever convicted of perjury would seek a new trial based upon a claim of constitutional violation. The courts would then have to decide on a case-by-case basis whether the five-year limitation fixed in *Rule* 3:22–12 should be relaxed. *Afanador, supra,* 151 *N.J.* at 52, 697 *A.*2d 529; *State v. Mitchell,* 126 *N.J.* 565, 580, 601 *A.*2d 198 (1992). "When appropriate, the procedural bars imposed by *Rules* 3:22–4, 3:22–5, and 3:22–12 may be asserted to preclude post-conviction relief, but . . . when meritorious issues are raised that require analysis and

explanation, our traditions of comprehensive justice will best be served by decisions that reflect thoughtful and thorough consideration and disposition of substantive contentions." *State v. Preciose,* 129 *N.J.* 451, 477–78, 609 *A.*2d 1280 (1992).

The Appellate Division suggests that we could limit post-conviction attacks to five years after the *Anderson* decision was issued in 1992 because the average sentence for a perjury conviction is three to five years. However, even when a sentence has been served, a defendant may seek relaxation of the five-year rule in an endeavor to obtain a retrial or an expungement of a perjury conviction based on *Anderson.* Although we do not know the number of those types of petitions, they could be potentially voluminous. Moreover, without a defendant's consent, the State would not be able to downgrade an unconstitutional perjury conviction to fourth-degree false swearing in which materiality is not an element, *N.J.S.A.* 2C:28–2, in order to avoid a retrial. *See, e.g., State v. Barboza,* 115 *N.J.* 415, 423, 558 *A.*2d 1303 (1989) (stating State is not permitted to downgrade defendant's conviction to lesser included offense without consent of defendant after appellate court determines no factual basis for guilty plea exists.) To permit a trial court to downgrade to a fourth-degree offense without a defendant's consent would be "tantamount to permitting a court to direct a verdict against a defendant in a criminal case." *Ibid.* at 423, 558 *A.*2d 1303. Directing a verdict of guilty on a lesser included fourth-degree offense deprives a defendant of the constitutional right to a fair trial before a jury. *State v. Collier,* 90 *N.J.* 117, 122–23, 447 *A.*2d 168 (1982). We conclude, therefore, that the third and final New Jersey retroactivity factor does not support retroactive application of *Anderson* to defendant's PCR petition.

We hold that the application of our State's broader retroactivity jurisprudence to defendant's PCR petition on collateral attack demonstrates that there should not be retroactive application of our decision in *Anderson* to defendant's PCR petition.

-B-

Under federal retroactivity law, the first occasion the United States Supreme Court addressed the retroactivity issue in modern times was in *Linkletter v. Walker*, 381 *U.S.* 618, 85 *S.Ct.* 1731, 14 *L.Ed.*2d 601 (1965). After tracing the historical development of federal and state retroactivity law, the Supreme Court rejected a claim that the federal constitution mandated retroactive application of *Mapp v. Ohio*, 367 *U.S.* 643, 81 *S.Ct.* 1684, 6 *L.Ed.*2d 1081 (1961), a decision requiring state courts to exclude evidence seized in violation of the Fourth Amendment. *Id.* at 629, 85 *S.Ct.* at 1737, 14 *L.Ed.*2d at 608. After recognizing that the Constitution neither required nor prohibited retroactivity, the Court held that selecting the proper retroactive choice required a court to "weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation." *Ibid.*, 381 *U.S.* at 629, 85 *S.Ct.* at 1738, 14 *L.Ed.*2d at 608. Within three years after *Linkletter* was decided, those three factors were incorporated into a three-pronged federal retroactivity test, consisting of (1) the purpose to be served by the new rule, (2) the extent of reliance by law enforcement on the old rule, and (3) the effect retroactive application of the new rule would have on the administration of justice. *Stovall v. Denno*, 388 *U.S.* 293, 297, 87 *S.Ct.* 1967, 1970, 18 *L.Ed.*2d 1199, 1203 (1967). That is the same standard adopted in New Jersey in *Knight*. Similar to the New Jersey rule, the starting point under the federal test adopted in *Linkletter* and *Stovall* was whether a new rule of law was involved. *United States v. Johnson*, 457 *U.S.* 537, 549, 102 *S.Ct.* 2579, 2586, 73 *L.Ed.*2d 202, 213 (1982).

In *Griffith v. Kentucky*, 479 *U.S.* 314, 107 *S.Ct.* 708, 93 *L.Ed.*2d 649 (1987), the Supreme Court abandoned the *Linkletter/Stovall* three-pronged approach in cases pending on direct review. In *Griffith*, the Court drew a distinction between cases pending on direct review and those brought on collateral attack, and held that a new rule of law concerning the conduct of criminal prosecutions

is to be applied retroactively to *all* cases pending on direct review and to those cases not yet final. *Id.* at 328, 107 *S.Ct.* at 716, 93 *L.Ed.*2d at 661. The Court in *Griffith* made no exception for cases in which the new rule of law constitutes a "clear break" with the past. *Ibid.* Consequently, the *Griffith* federal retroactivity test for cases pending on direct review is broader than New Jersey's current three-pronged approach. Under *Griffith,* federal retroactivity jurisprudence calls for retroactive application of new rules of law to *all* cases pending on direct review when the new rule of law concerns the conduct of criminal prosecutions.

The last major shift in federal retroactivity law came in *Teague v. Lane,* 489 *U.S.* 288, 109 *S.Ct.* 1060, 103 *L.Ed.*2d 334 (1989). In *Teague,* the Court again distinguished the retroactive application of a new rule of law in a direct appeal from the retroactive application of a new rule of law on collateral attack. The Court concluded that on collateral attack, a new rule of law is to be applied retroactively *only* where the rule represents a clear break with the past and meets one of two conditions: (1) the new rule places "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe[;]" or (2) the new rule requires "the observance of 'those procedures that ... are "implicit in the concept of ordered liberty." ' " *Id.* at 311, 109 *S.Ct.* at 1075–76, 103 *L.Ed.*2d at 356 (quoting *Mackey v. United States,* 401 *U.S.* 667, 692, 693, 91 *S.Ct.* 1160, 1180, 28 *L.Ed.*2d 404 (1971).) Thus, the federal standard under *Teague* is much stricter than our State standard for relief when a defendant seeks to collaterally attack a prior judgment of conviction.

Because the new rule announced in *Anderson* involves defendant's State constitutional right to a jury trial on each element of the perjury charge, as well as his right to due process and trial by jury under the Fifth and Sixth Amendments of the Federal Constitution under *Gaudin,* we must decide whether under the *Teague* standard defendant can collaterally attack his perjury conviction in his post-judgment proceeding. *Lark, supra,* 117 *N.J.* at 335, 567 *A.*2d 197. Although the applicable state and

federal retroactivity standards differ, the constitutional protections announcing the new rule of law in *Anderson* and *Gaudin* are co-extensive. Given that this case involves a collateral attack on the perjury conviction, and we have already decided that based on New Jersey's retroactivity standard defendant is not entitled to retroactivity of the new rule announced in *Anderson,* the only issue remaining under the federal standard as limited by *Teague* is whether the new rule articulated in *Gaudin* involves "procedures that ... are 'implicit in the concept of ordered liberty.'" *Teague, supra,* 489 *U.S.* at 311, 109 *S.Ct.* at 1076, 103 *L.Ed.*2d at 356 (quoting *Mackey, supra,* 401 *U.S.* at 693, 91 *S.Ct.* at 1180, 28 *L.Ed.*2d at 421). There is no claim that the first of the two *Teague* conditions is involved in this case.

Defendant contends that his right to a jury trial on the element of materiality involves a procedure that is implicit in the concept of ordered liberty, and therefore, he is entitled to have *Gaudin* applied retroactively to his PCR petition. *Teague* is instructive concerning the intended meaning of its second exception. It provides that the ordered liberty exception requires that "the procedure at issue must implicate the fundamental fairness of the trial." *Id.* at 312, 109 *S.Ct.* at 1076, 103 *L.Ed.*2d at 357. The "scope of the second exception [is limited] to those new procedures without which the likelihood of an accurate conviction is seriously diminished." *Id.* at 313, 109 *S.Ct.* at 1077, 103 *L.Ed.*2d at 358. The ordered liberty exception under *Teague* has come to be known as "structural error." *Arizona v. Fulminante,* 499 *U.S.* 279, 310, 111 *S.Ct.* 1246, 1265, 113 *L.Ed.*2d 302, 331 (1991). Structural error is defined as a "structural defect[ ] in the constitution of the trial mechanism, which [defies] analysis by 'harmless-error' standards." *Id.* at 309–10, 111 *S.Ct.* at 1265, 113 *L.Ed.*2d at 331. A structural error has also been defined as a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Johnson v. United States,* 520 *U.S.* 461, 468, 117 *S.Ct.* 1544, 1549, 137 *L.Ed.*2d 718, 728 (1997).

Thus, a structural error affects the legitimacy of the entire trial, rather than an isolated error that occurs during a certain part of the trial process and does not contaminate the trial as a whole. Accordingly, the Supreme Court has found structural error to exist "only in a very limited class of cases." *Ibid.* Examples of such cases include: *Sullivan v. Louisiana,* 508 *U.S.* 275, 113 *S.Ct.* 2078, 124 *L.Ed.*2d 182 (1993) (finding erroneous reasonable-doubt instruction to jury); *Vasquez v. Hillery,* 474 *U.S.* 254, 106 *S.Ct.* 617, 88 *L.Ed.*2d 598 (1986) (finding unlawful exclusion of grand jurors of defendant's race); *Waller v. Georgia,* 467 *U.S.* 39, 104 *S.Ct.* 2210, 81 *L.Ed.*2d 31 (1984) (finding right to a public trial); *McKaskle v. Wiggins,* 465 *U.S.* 168, 104 *S.Ct.* 944, 79 *L.Ed.*2d 122 (1984) (finding right to self-representation at trial); *Gideon v. Wainwright,* 372 *U.S.* 335, 83 *S.Ct.* 792, 9 *L.Ed.*2d 799 (1963) (finding total deprivation of right to counsel); *Tumey v. Ohio,* 273 *U.S.* 510, 47 *S.Ct.* 437, 71 *L.Ed.* 749 (1927) (finding lack of an impartial trial judge).   Each of the foregoing constitutional errors is similar in that the error affected the framework within which the trial occurred rather than the trial process itself.

*State v. Sanchez,* 129 *N.J.* 261, 609 *A.*2d 400 (1992), like *Gideon,* involved a deprivation of the right to counsel. *Sanchez* held that the mere recitation of a *Miranda* warning does not provide an indicted defendant with sufficient information to make a knowing and intelligent waiver of the right to counsel. Yet in *Knight,* we refused to afford complete retroactivity to *Sanchez.   Knight, supra,* 145 *N.J.* at 258, 678 *A.*2d 642.   The Court reasoned that "because the [pre-*Sanchez*] rule did not substantially impair the reliability of the truth-finding process, we will not burden the criminal justice system with the post-conviction-relief applications and retrials that would result from a fully retroactive application of the *Sanchez* decision." *Ibid.* Similarly, the rule that prevailed before *Anderson* did not impair the reliability of the truth-finding process in the present case.

*Teague* requires that in order to be deemed implicit in the concept of ordered liberty, a new rule must be a "watershed rule,"

that is, one that (1) is aimed at improving the *accuracy* of trial and (2) alters our understanding of the bedrock procedural elements essential to the fairness of the proceedings. 489 *U.S.* at 311, 109 *S.Ct.* at 1076, 103 *L.Ed.*2d 334. Thus, in *Bilzerian v. United States*, the court observed:

> That a jury determination of guilt or innocence is an important element of a criminal trial does not necessarily mean that *Gaudin* is a "watershed rule" of criminal procedure. Watershed rules "alter our understanding of the bedrock procedural elements" essential to the fairness of a trial.... The rule in *Gaudin* merely shifts the determination of materiality from the judge to the jury. This shifting does not "alter our understanding of the bedrock procedural elements" essential to the fairness of a trial.
>
> [127 *F.*3d 237, 241 (2d Cir.1997), *petition for cert. filed,* —— *U.S.* ——, 119 *S.Ct.* 2365, —— *L.Ed.*2d —— (1998) (internal citations omitted).]

*Accord United States v. Shunk,* 113 *F.*3d 31, 37 (5th Cir.1997) (stating "one can easily envision a system of 'ordered liberty' in which certain elements of a crime can or must be proved to a judge, not to the jury"); *United States v. Swindall,* 107 *F.*3d 831, 836 (11th Cir.1997) (stating "[t]he fact that the *Gaudin* rule does not improve the accuracy of the trial is sufficient to render *Teague's* second exception inapplicable"); *United States v. Holland,* 919 *F.Supp.* 431, 434–35 (N.D.Ga.1996) (stating "[a]pplication of the *Gaudin* rule, while implicating constitutional concerns, does not improve the accuracy of the trial.... The harm to be corrected by *Gaudin* was not the inaccuracy of the decision; rather, the problem to be corrected was that the wrong entity was making the decision").

The Appellate Division found such federal cases "unpersuasive" and reasoned that "none ... gives sufficient weight to [the] due process implications [of *Gaudin* ]." *Purnell, supra,* 310 *N.J.Super.* at 417–18, 708 *A.*2d 1196. Rather than considering whether the *Anderson* rule represents a "watershed rule" of criminal procedure—as the federal cases require—the Appellate Division seems to suggest that any time due process is implicated by a new rule of criminal procedure, full retroactive effect must follow. That approach is more in keeping with the *Griffith* rule than the controlling standard articulated in *Teague.*

The Appellate Division did not give full credence to *Johnson*. In *Johnson*, the Supreme Court held that *Griffith, supra*, 479 *U.S.* at 328, 107 *S.Ct.* at 716, 93 *L.Ed.*2d at 661, mandated the retroactive application of *Gaudin* to all cases pending on direct review. *Johnson, supra*, 520 *U.S.* at 467, 117 *S.Ct.* at 1549, 137 *L.Ed.*2d at 727. Nevertheless, based on the evidence in the record, *Johnson* unanimously found that the determination of materiality by the trial court did not seriously impair the fairness or integrity of the judicial proceedings. *Id.* at 468, 117 *S.Ct.* at 1549–50, 137 *L.Ed.*2d at 727–29. We are therefore persuaded that the *Gaudin* rule is not a bedrock principle of criminal procedure; nor is it "implicit in the concept of ordered liberty."

The *Johnson* principle was reaffirmed recently in *Neder v. United States*, —— *U.S.* ——, ——, 119 *S.Ct.* 1827, 1835, 144 *L.Ed.*2d 35, —— (1999). While *Gaudin* was pending on appeal, Neder was convicted of federal tax fraud, mail fraud, wire fraud, and bank fraud. *Id.* at ——, 119 *S.Ct.* at 1832, 144 *L.Ed.*2d at ——. The trial court determined that materiality as an element of the offenses was to be decided by the court rather than the jury. *Ibid.* The Eleventh Circuit held that although the trial court's failure to submit the materiality element to the jury violated *Gaudin*, the error was harmless because materiality was not in dispute and therefore did not contribute to the verdict. *Ibid.* The Supreme Court agreed and held that even in a direct appeal in which *Gaudin* requires submission of the materiality issue to the jury, failure to do so may constitute harmless error. *Id.* at ——, 119 *S.Ct.* at 1834, 144 *L.Ed.*2d at ——. The Court found that failure to comply with *Gaudin* does not constitute structural error. Consequently, the language in Justice Scalia's dissent in *Neder*, quoted by Justice O'Hern in his dissent, *infra* at 52 – 54, 735 *A.*2d at 517 – 18, is simply rhetoric that has no application to the present case. Here, defendant has made a collateral attack upon his perjury conviction and is seeking to have *Gaudin* applied retroactively.

Although the issue of materiality was controverted in the present case, the evidence supporting the issue came from defendant's daughter. The issue was decided by the judge rather than the jury based on trustworthy evidence in conformity with standards that have been constitutionally approved for more than one-and-a-half centuries. The judge used the same burden of proof standard in deciding the issue of materiality here as would the jury. Based on the facts of the case, we conclude that the procedure employed in defendant's trial for perjury is a "far cry [different] from the kind of absolute prerequisite to the fundamental fairness that is 'implicit in the concept of ordered liberty.'" *Teague, supra,* 489 *U.S.* at 314, 109 *S.Ct.* at 1077, 103 *L.Ed.*2d at 358. The procedural defect involved here that was changed after more than a century and a half does not represent the kind of bedrock procedural element that should be retroactively applied.

## IV

In summary, we hold that defendant is not permitted to collaterally attack his prior judgment of conviction for perjury by having the new rule announced in *Anderson* and *Gaudin* retroactively applied. The judgment of the Appellate Division is accordingly reversed.

O'HERN, J., dissenting.

Braynard Purnell is serving a life sentence with a thirty year parole disqualifier in State Prison for murder. He will also serve a consecutive five-year sentence for perjury if his conviction thereof is sustained. The perjury sentence will be served concurrently with a five-year sentence for hindering apprehension, two years of which are parole ineligible, also consecutive to the murder sentence. The Court's decision will probably not mean a great loss of street time for defendant but there is a matter of principle involved.

The facts of the murder are set forth in our reported decision at 126 *N.J.* 518, 601 *A.*2d 175 (1992). Briefly stated, the murder

involved an argument over drugs between Purnell and a drug dealer in Purnell's back yard. In the course of the investigation, Purnell appeared before a Grand Jury and testified that he had returned to his house and entered through the front door. His daughter testified that he had come back into the house through a rear window. The Grand Jury indicted Purnell for the murder of the drug dealer, possession of a weapon with intent to use it unlawfully, hindering apprehension, and perjury. This was a capital case and defending against the perjury count could not have been a very high priority for defense counsel. Although they moved at trial to dismiss the perjury count on the ground that materiality had not been proven, Purnell's attorneys never requested that the issue of materiality be decided by the jury. Purnell's trial took place in January and February 1990.

In 1992, this Court decided *State v. Anderson*, 127 *N.J.* 191, 603 *A.*2d 928, which held that the materiality of an allegedly perjurious statement is to be decided by a jury, not by a judge. Among the several issues raised in Purnell's post-conviction relief proceeding was that he had been entitled to trial by jury on the materiality of the difference between Purnell's entry by the front door versus by the rear window.

Post-conviction relief (PCR) is the New Jersey analogue to the federal writ of *habeas corpus*. It is a safeguard to ensure that defendant was not unjustly convicted. Ordinarily, PCR enables a defendant to challenge a final judgment of conviction by presenting contentions that could not have been raised on direct appeal. *State v. McQuaid*, 147 *N.J.* 464, 482, 688 *A.*2d 584 (1997).

Pursuant to *Rule* 3:22–2, a defendant may seek PCR on four grounds: "(a) substantial denial in the conviction proceedings of a defendant's state or federal constitutional rights; (b) a sentencing court's lack of jurisdiction; (c) an unlawful sentence; and (d) any *habeas corpus,* common-law, or statutory grounds for a collateral attack." *State v. Preciose*, 129 *N.J.* 451, 459, 609 *A.*2d 1280 (1992) (internal quotations omitted). The Court does not rely on any of the procedural bars set forth in *Rule* 3:22 but relies on the fact

that the principle of *Anderson* should not provide retroactive relief. I disagree.

The *Anderson* doctrine was based on the New Jersey State Constitution, not the federal Constitution. Although federal constitutional retroactivity doctrine sets the constitutional threshold, it does not set the ceiling for retroactivity.

*Teague v. Lane,* 489 *U.S.* 288, 109 *S.Ct.* 1060, 103 *L.Ed.*2d 334 (1989), established a restrictive federal approach to retroactivity in order to effect a "proper allocation of responsibility between the state and federal courts in the area of constitutional criminal procedure" and to eliminate the "perceived encroachment of federal habeas on state courts." Mary C. Hutton, *Retroactivity in the States: The Impact of Teague v. Lane on State Postconviction Remedies,* 44 *Ala. L.Rev.* 421, 449 (1993) (footnote omitted). The *Teague* plurality

> thought that its approach would comport . . . with the central purpose of federal habeas corpus. . . . [H]abeas is not simply another layer of review for constitutional error, but an extraordinary remedy with a far more limited function of supplying "a necessary additional incentive for trial and appellate courts throughout the land to conduct their proceedings in a manner consistent with established constitutional standards."
>
> [Richard H. Fallon, Jr. & Daniel J. Meltzer, *New Law, Non-retroactivity, and Constitutional Remedies,* 104 *Harv. L.Rev.* 1731, 1747 (1991) (quoting *Teague, supra,* 489 *U.S.* at 306, 109 *S.Ct.* at 1073, 103 *L.Ed.*2d at 353).]

New Jersey's retroactivity analysis, although generally consistent with that of the United States Supreme Court, is considerably less restrictive. *State v. Cupe,* 289 *N.J.Super.* 1, 12, 672 *A.*2d 1233 (App.Div.) *certif. denied,* 144 *N.J.* 589, 677 *A.*2d 761 (1996) (noting federal courts' reluctance to apply law retroactively on collateral attack rather than direct review). We recently reviewed our principles of retroactivity analysis:

> In deciding whether to give a decision retroactive effect, there are several options available to the Court, ranging from complete retroactivity to complete prospectivity. *See Cupe, supra,* 289 *N.J.Super.* at 12, 672 *A.*2d 1233 (enumerating the four options). However, before the Court chooses from among the varied options, it customarily engages in the threshold inquiry of whether the rule at issue is a "new rule of law" for purposes of retroactivity analysis. *Id.* at 11, 672 *A.*2d 1233. Our cases have recognized that if a ruling does not involve a "departure from existing

law," the retroactivity question never arises and our power to limit the retroactive effect of a decision is not implicated. *State v. Burstein,* 85 *N.J.* 394, 403, 427 *A.2d* 525 (1981).... [*State v.*] *Knight* [145 *N.J.* 233, 251, 678 *A.2d* 642 (1996) ] continued to explain:

> if a decision indeed sets forth a "new rule," three factors generally are considered to determine whether the rule is to be applied retroactively: "(1) the purpose of the rule and whether it would be furthered by a retroactive application, (2) the degree of reliance placed on the old rule by those who administered it, and (3) the effect a retroactive application would have on the administration of justice." *State v. Nash,* 64 *N.J.* 464, 471, 317 *A.2d* 689 (1974).... Although those three factors have received detailed attention in our retroactivity case law, our cases also indicate that the retroactivity determination often turns more generally on "the court's view of what is just and consonant with public policy in the particular situation presented." [*Nash, supra,* 64 *N.J.*] at 469, 317 *A.2d* 689, ... [T]he purpose of the new rule[ ] is often the pivotal consideration. *Burstein, supra,* 85 *N.J.* at 406, 427 *A.2d* 525. For example, if the newly announced rule is an exclusionary rule intended solely to discourage police misconduct, then the rule's purpose would not be served by applying the rule to conduct occurring before the rule was announced. For that reason, exclusionary rules are rarely given retroactive effect. *Ibid.*

> [*State v. Afanador,* 151 *N.J.* 41, 57–58, 697 *A.2d* 529 (1997).]

The purpose of the *Anderson* ruling is to implicate the fundamental right of trial by jury through the proper allocation of the functions of judge and jury. Retroactive application of the rule surely fosters that purpose. Nothing could be more intrinsic to fostering the "reliability of the truth-finding process," *Afanador, supra,* 151 *N.J.* at 58, 697 *A.2d* 529, than the proper allocation of these functions. This is particularly true in light of the unique role of the jury in criminal prosecutions, which itself led to the *Anderson* rule. In criminal jurisprudence there is a qualitative distinction between judge and the jury, particularly on the issue of deciding an element of a crime. The determination of guilt is highly nuanced, and it is impossible to say in respect of any criminal conviction that the separate determination of an element by a judge will be given the same probative worth or weight in the ultimate verdict of guilt as would have been given by the jury itself. The determination of criminal guilt is indissoluable and cannot be assessed as simply the amalgam of its underlying elements. As the Court explained:

> The responsibility of the jury in the domain of factual findings, and ultimate guilt or innocence, is so pronounced and preeminent that we accept inconsistent verdicts that accrue to the benefit of a defendant. Indeed, a jury has the prerogative of returning a verdict of innocence in the face of overwhelming evidence of guilt. It may also refuse to return a verdict in spite of the adequacy of the evidence. This is indicative of a belief that the jury in a criminal prosecution serves as the conscience of the community and the embodiment of the common sense and feelings reflective of society as a whole.
>
> [*State v. Ingenito*, 87 *N.J.* 204, 211–12, 432 *A.2d* 912 (1981) (citations omitted). *Accord, State v. Simon*, 79 *N.J.* 191, 398 *A.2d* 861 (1979) (rejecting use of interrogatories submitted to jury before beginning deliberations to prevent effect of subliminally suggesting defendant's guilt).]

The jury deliberations process is not an exercise in logic or pure science, and removing or subtracting one segment from the deliberative process does not simply leave a numerical remainder—it plausibly affects the overall calculus of innocence or guilt. For example, in *Ingenito,* the Court held that the use of defendant's prior conviction for unlicensed transfer of a weapon as the sole basis for establishing the element of possession in a separate trial for possession of a firearm by a convicted felon impinged on defendant's constitutional right to a fair jury trial. The Court reasoned:

> If an essential element of a case is presented as concluded or settled, effectively withholding from the jury crucial underlying facts, the jury's capacity to discharge fully its paramount deliberative and decisional responsibilities is irretrievably compromised. It follows in such circumstances that the defendant's jury right will have been, commensurately, abridged.
>
> [*Id.* at 213, 432 *A.2d* 912.]

Similarly, in *State v. Collier,* 90 *N.J.* 117, 447 *A.2d* 168 (1982), this Court reversed a decision to direct a verdict of guilty on a charge of contributing to the delinquency of a minor (by engaging in intercourse) in the trial of a charge for rape. Although both defendant and the victim conceded that they had engaged in intercourse, the Court was concerned with "improperly imping[ing] on the sensitive area of jury deliberation[s]." *Id.* at 123, 447 *A.2d* 168. The Court explained:

> The testimony differed sharply and apparently left the jury in doubt about the guilt of the defendant. The import of the directed verdict on the contributing charge was that the trial court told the jury that, no matter whom they believed, the defendant's conduct was criminal. In a case where so much turned on credibility,

the likelihood that the jury was improperly influenced by such a suggestion cannot be gainsaid.

Furthermore, if the jury had considered both charges, it is possible that it might have decided to return a verdict of guilty on the contributing charge instead of a verdict of guilty on the rape charge. By directing a guilty verdict on the contributing charge, however, the court limited the jury's role to a consideration of the rape charge.... In effect, the partial directed verdict on the contributing charge impaired the jury's ability to assess objectively the defendant's guilt on the rape charge.

[*Ibid.*]

These cases demonstrate that removing the determination of even the most seemingly uncontroverted element of a crime from the province of the jury strikes at the heart of the truth-finding process. Accordingly, the first *Nash* factor strongly suggests complete retroactive effect.

The next question is whether the second factor, past reliance, should outweigh the first factor. The *Anderson* rule appears to have been the result as much of indifference as of reliance. As Justice Scalia pointed out in *United States v. Gaudin*, the most that could be determined was that "there had developed a division of authority on the point, as the treatise writers of the period amply demonstrate." 515 *U.S.* 506, 518, 115 *S.Ct.* 2310, 2317, 132 *L.Ed.*2d 444, 455 (1995). Besides, the proposition itself was contrary to the uniform general understanding that a fair trial requires conviction by a jury of all the elements of a crime. In *Ingenito, supra*, we said, "the right to a jury in a criminal trial ordinarily includes the right to have the same trier of the fact decide all of the elements of the charged offense." 87 *N.J.* at 217, 432 *A.*2d 912. "We have characterized the jury's responsibility to decide the facts as 'nondelegable and nonremovable.'" *Anderson, supra*, 127 *N.J.* at 199, 603 *A.*2d 928 (quoting *Ingenito, supra*, 87 *N.J.* at 211, 432 *A.*2d 912). In retrospect, as Justice Clifford pointed out in *Anderson:*

the rule that characterized materiality in perjury cases as a question of law became well established as later opinions cited the early cases, apparently with little or no independent analysis.... Thus, the allocation to the court of the determination of materiality became firmly entrenched in the law without having been subjected to detailed scrutiny or having been harmonized with the requirements of due process and the right to a jury trial.

[*Anderson, supra,* 127 *N.J.* at 204, 603 *A.2d* 928.]

The majority invokes the familiar parade of horribles, suggesting that a torrent of post-conviction relief applications will be presented to challenge perjury convictions. *Ante* at 56–57, 735 *A.2d* at 519–20. A survey of New Jersey's reported cases since the date of the *Anderson* decision in 1992 discloses no other reported case in which the issue has ever been raised on post-conviction relief. Any application made more than five years after the 1992 *Anderson* decision will have to surmount the five-year bar of *Rule* 3:22–12. *See Afanador, supra,* 151 *N.J.* at 52, 697 *A.2d* 529 (explaining exceptional circumstances necessary for court to relax that bar).

Even if we were to apply federal constitutional doctrine, it strikes me as somewhat anomalous to suggest to a defendant that the structural integrity of a trial is not altered when the functions of judge and jury are incorrectly allocated. "History establishes that New Jersey colonists placed a high premium on the right to trial by jury." *State v. One 1990 Honda Accord,* 154 *N.J.* 373, 383, 712 *A.2d* 1148 (1998). We diminish respect for that right when we minimize its importance.

Justice Scalia recently reminded us that

depriving a criminal defendant of the right to have the jury determine his guilt of the crime charged—which necessarily means his commission of *every element* of the crime charged—can never be harmless.

. . . .

The very premise of structural-error review is that even convictions reflecting the "right" result are reversed for the sake of protecting a basic right.

. . . .

Harmless-error review applies only when the jury actually renders a verdict—that is, when it has found the defendant guilty of all the elements of the crime.

. . . .

Formal requirements are often scorned when they stand in the way of expediency. This Court, however, has an obligation to take a longer view.

[*Neder v. United States*, —— *U.S.* ——, —— – ——, 119 *S.Ct.* 1827, 1844–48, 144 *L.Ed.*2d 35, —— – —— (1999) (Scalia, J., dissenting).]

I therefore dissent.

·Justices HANDLER and POLLOCK join in this dissent.

*For reversal*—Chief Justice PORITZ and Justices GARIBALDI, STEIN and COLEMAN—4.

*For affirmance*—Justices HANDLER, POLLOCK and O'HERN—3.